**In re DOMINION CORPORATION, fdba Dominion Systems, Inc., Debtor.**

**Mohamed POONJA, Trustee, Appellant,**

v.

**CHARLES SCHWAB & CO., INC., Appellee.**

BAP No. NC–95–1707–VRAs.
Bankruptcy No. 92–30432TC.
Adv. No. 94–3087TC.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 24, 1996.

Decided Aug. 15, 1996.

Barry Milgrom, Kevin W. Coleman, San Francisco, CA, for Appellant.

Bernard A. Burk, Mark A. Sponseller, San Francisco, CA, for Appellee.

Before: VOLINN, RUSSELL, and ASHLAND, Bankruptcy Judges.

### *OPINION*

VOLINN, Bankruptcy Judge:

### OVERVIEW

The principal of a chapter 11 debtor in possession used estate funds to open a securities account with appellee stockbrokerage firm in the debtor's name and used the account for his personal benefit without first seeking or obtaining bankruptcy court approval. The account provided a VISA debit card secured by the funds and securities in the account. Appellee debited the account for amounts paid against purchases made with the card. The chapter 7 trustee appointed after conversion of the case brought an adversary proceeding to recover from the stockbrokerage firm the amounts debited against the account. The bankruptcy court granted the stockbrokerage's cross-motion for summary judgment and dismissed the trustee's complaint. We AFFIRM.

### FACTS AND PROCEEDINGS BELOW

The Dominion Corporation filed a voluntary chapter 11 petition on January 30, 1992. A chapter 11 trustee was appointed September 2, 1992. The case was converted to chapter 7 on October 30, 1992, and Mohamed Poonja, plaintiff below and appellant here, was appointed chapter 7 trustee.

Until the appointment of the chapter 11 trustee and the subsequent conversion of the case, Dominion was operated as debtor in possession by William L. Johnson, its president and secretary. On February 25, 1992, Johnson caused Dominion to open a "Schwab One Account" (the account) with appellee Charles Schwab & Co., Inc., a stockbrokerage firm. The account had two features: a brokerage account, consisting of a cash account and a margin and short account, and a bank account with a VISA debit card and checking privileges.

The customer was authorized to write checks or use the VISA debit card with third parties to pay for goods and services. Charges so made would be debited against the cash and securities in the brokerage account. In the event of an overdraft, Schwab was authorized to advance credit against securities in the account up to permissible margin limits.

Because Schwab is not a bank, the banking services provided with the account were furnished under an agreement between Schwab and Bank of America (B of A). B of A would issue the VISA card to a Schwab customer and clear charges made with the card with VISA USA, Inc. and VISA International. Schwab in turn maintained a "clearing account" at B of A. B of A would pay merchants or intermediate banks for charges and credit itself for the daily total against the clearing account. Schwab would then post corresponding debits to the individual customers' accounts.

Between February and August, Johnson deposited nearly $50,000 of estate funds into the account and then spent it all. He purchased some $2,000 worth of securities and subsequently sold them at a slight loss. In the main, however, his purchases, which included limousine services, hotel accommodations, and airline tickets, were for his personal benefit and were not approved by the bankruptcy court. After B of A credited itself in Schwab's clearing account for these expenditures, Schwab debited Dominion's account. The cash in the account was sufficient to satisfy all checks and debit card transactions save one: at one point, Johnson created an overdraft of some $800, which Dominion satisfied by selling securities in the account. By the time a trustee was appointed, the account was exhausted and stood overdrawn by about $600.

In February 1994, the trustee filed an adversary proceeding to recover the diverted funds, naming Schwab, B of A, Johnson, and merchants providing goods and services that Johnson paid for through the account. The trustee contended that Schwab's debiting of Dominion's account to credit such amounts to its own use made Schwab the initial transferee of unauthorized and avoidable postpetition transactions under § 549 and therefore liable to the estate under § 550(a)(1). On cross-motions for summary judgment, Schwab contended it was not a transferee at all, but merely a conduit for the funds. The bank-

ruptcy court agreed, dismissing the trustee's complaint against Schwab and this appeal follows.[1]

## STANDARD OF REVIEW

■ Summary judgments are reviewed *de novo*, as are the bankruptcy court's conclusions of law. *In re Florida*, 164 B.R. 636, 639 (9th Cir. BAP 1994).

## ISSUE PRESENTED

Whether an entity that maintains accounts for customers is a transferee for purposes of § 550 when it credits itself from the customer's account for payments it has made upstream in the clearing procedure for charges made by the customer.

## DISCUSSION

■ Pursuant to the Bankruptcy Code,[2] 11 U.S.C. § 549,[3] the trustee may avoid a transfer of estate property not authorized by any provision of the Code or by the bankruptcy court that occurs after the commencement of the case. All of the transfers at issue here, totalling some $50,000, were unauthorized, and all occurred after commencement of the case.

■ When a transfer is avoidable, § 550(a)[4] provides that the trustee may recover the avoided property—or its value—for the benefit of the estate from the initial

---

1. The trustee sought, but the court denied certification for appeal of the judgment under Fed. R.Civ.P. 54(b). Subsequently, the court disposed of the remaining claims against the remaining defendants. The order is now final and reviewable. *Fadem v. United States*, 42 F.3d 533 (9th Cir.1994).

2. Unless otherwise stated, references to "sections" and "rules" will refer to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., and Federal Rules of Bankruptcy Procedure 1001–9036.

3. [T]he trustee may avoid a transfer of property of the estate—

    (1) that occurs after the commencement of the case; and
    (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
      (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a).

4. (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2) any immediate or mediate transferee of such initial transferee.
  (b) The trustee may not recover under section (a)(2) of this section from—
    (1) a transferee that takes for value, including satisfaction or securing a present antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
    (2) any immediate or mediate good faith transferee of such transferee.

transferee and the entity for whose benefit the transfer was made, and from any subsequent transferees, both "immediate and mediate." This chain of potentially liable parties is cut off by a subsequent transferee who takes for value and in good faith. The initial transferee and the entity for whose benefit the transfer was made, however, are held strictly liable to the trustee. *In re Bullion Reserve of N. Am.*, 922 F.2d 544, 547 (9th Cir.1991); *In re Presidential Corp.*, 180 B.R. 233, 236 (9th Cir. BAP 1995). Even where he has taken in good faith and for value, the only recourse for an initial transferee is a general unsecured claim in the bankruptcy under § 502(h). The initial transferee is held to be in the best position to evaluate the transaction and protect itself (and collaterally, the estate) from unauthorized transfers of property out of the estate. *Id.* at 237 (citing *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 892–93 (7th Cir.1988)).

■ The Code defines "transfer" broadly, to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." § 101(54). However, the Code does not define what a transferee is. The absence of a definition for "transferee" and the harsh result of an overly literal approach to § 550 give rise to the "conduit" defense to avoidance liability.

The defense first arose in *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966), and the Code has legislated the exception in § 542(c).[5] The accepted definition of "transferee" was devel-

oped in *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890 (7th Cir.1988), which established the "dominion" or "control" test:

> Although the Bankruptcy Code does not define "transferee," and there is no legislative history on the point, we think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee;" the agent may be disregarded.

*Bonded Fin.*, 838 F.2d at 893.

The conduit is merely a facilitator. It does not assert sufficient control over the funds passing through its hands to be considered a transferee of the transfer, even though a routine commercial exchange—the payment for goods by check, for example, or a charge made on a debit card in an account such as the one at issue here—can be viewed as a series of transfers rather than a simple one-step transaction. To this end, courts are admonished to "step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *Bullion Reserve*, 922 F.2d at 549 (quoting *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1199 (11th Cir.1988)).[6] An entity does not have dominion or control unless it is "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded Fin.* at 894. While this latter test is at the outer extreme, its essential reference to the element of unfettered control has been adopted by the Ninth Circuit and the BAP. *Bullion Reserve* at 549; *Presidential* at 236.

■ The parties focus on the transfer of funds out of the account.[7] The trustee con-

---

11 U.S.C. § 550.

5. Section 542(c) provides in pertinent part that, with certain exceptions not relevant here:

an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith ... to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title concerning the debtor had not been commenced.
11 U.S.C. § 542(c).

6. " 'Transferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent'. To treat 'transferee' as 'anyone who touches the money' and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam's Razor and leave a more functional rule." *Bonded Fin.*, 838 F.2d at 894. [*Occam's Razor:* "the philosophic rule that entities should not be multiplied unnecessarily." *Webster's Third New International Dictionary* 1969.]

7. The parties do not regard Johnson's initial funding of the account to be an avoidable trans-

tends this transfer went to Schwab, and that was the end of it; it is technically correct that when Schwab received the funds, it was under no obligation to transfer them to anyone else. The trial court applied the conduit theory:

> [I]t doesn't seem to me that 549 is aimed at regulating how the debtor processes its money in terms of whatever transactions it gets at. It seems that this is not a real loan where the debtor is basically incurring debt, and getting money by incurring debt that the Court and—or the creditors have not approved.
>
> It's not going on and making investments or buying things out of the ordinary course of business by using this card. This is just sort of a neutral vehicle to do things that are authorized or unauthorized, but ... 549 is not aimed at getting transactions that merely involve the handling of debtor's money, of turning it from one form into another where it's still cash.

*Transcript of Proceedings,* May 26, 1995 at 11:11–23.

The trustee raises two objections to the court's application of the conduit defense in Schwab's favor: the defense has not been nor should be adopted by this Circuit, and in any event, would not apply to the circumstances and structure of the transactions at issue. We take each in turn.

The trustee is not correct as to applicability of the conduit defense in the Ninth Circuit. For instance, the Ninth Circuit has held that "for purposes of section 550, a bank is not the equivalent of a client who has an account at the bank." *In re California Trade Technical Schools, Inc.,* 923 F.2d 641, 649 (9th Cir.1991) (citing *Bonded Financial* ).

To support the contention that the conduit theory is unavailable, the trustee urges the plain language of the statute be applied, citing *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). However, in an earlier case, more on point, the Supreme Court ruled that the language of § 70d(5),[8] § 550's predecessor under the former Bankruptcy Act, was not to be strictly applied when to do so would be inequitable. The court there stated, "Yet we do not read these statutory words with the ease of a computer. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). The court then reversed a judgment which held a bank liable for paying on a check drawn on the bankrupt's account after the filing of a bankruptcy petition, when the bank had no notice of the bankruptcy.

The trustee also attempts to distinguish the structure of the instant transactions from those to which the conduit defense clearly applies: simple checking transactions. To this end, he points to various differences: 1) the account contract granted Schwab a lien on funds and securities in the account to secure its payment for charges; 2) a bank's ability to charge-back checks in the event of insufficient funds; 3) the "automatic" and "instant" payment through ATM debit cards as opposed to the somewhat longer time period involved here. These distinctions are not dispositive. The lien on account funds came into play only once (concerning the $800 overdraft) and thus is not pertinent to review. Too, this lien was part of the transaction establishing the account, which, as indicated, the parties have not attacked. Similarly, a bank's charge-back capability would not have come into play as the account was functionally solvent as to all the charges

---

fer under this section. Most likely, they considered that this activity was authorized under § 363 as use of estate property in the ordinary course of business, although a debtor in possession (particularly a construction company) does not ordinarily open a margin account with a stockbroker. To be sure, the funds placed in the account nominally remained estate property; Johnson provided Schwab with the appropriate corporate warrantees to establish the account in Dominion's name. Johnson didn't tell Schwab that Dominion was in chapter 11, and Schwab didn't ask.

8. Section 70d(5) of the former Bankruptcy Act provided, with exceptions not relevant here, that "No transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee." Section 70(d)(5), 52 Stat. 882, 11 U.S.C. § 101(d)(5), *repealed by* Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 98 Stat. 2549.

made. And, finally, the timeliness of the clearing process is not material. Banks often take several days to clear the checking process.

The trustee's arguments all go to creating a creditor-debtor relationship between Schwab and the debtor. In reality, however, the type of account as created sought to avoid placing Schwab in a creditor position. Although Schwab was itself debited before debiting Dominion in response, these events in reality were computer file transfers which automatically transferred funds committed to Schwab by the debtor for the purpose of payment of the debits against Schwab by the bank for the debtor's purchases. Thus, the intended and actual transfers ran from Dominion to Johnson and then from Johnson to his purveyors of goods and services. Schwab and the bank were intermediaries or conduits.

Although the trial court did not actively investigate or rule on the issue, Schwab raises the point that Johnson is the initial transferee of the funds in the account. This is a correct assessment of Ninth Circuit law. In a case factually similar to the present facts, *In re Dietz,* 94 B.R. 637 (9th Cir. BAP 1988), *aff'd on other grounds,* 914 F.2d 161 (9th Cir.1990), the Panel affirmed the bankruptcy court's finding that the debtor was the initial transferee of estate funds which he misappropriated by depositing the funds in a secret bank account. The Panel looked to the Code's definition of "transfer," and, noting its broad application, determined that a transfer for purposes of § 549 did not necessarily require a transfer out of the estate, but could encompass an intra-estate transfer as well. The Panel stated, "although the checking account may have been property of the estate for purposes of § 541, such a determination would not preclude a finding that the debtor had 'transferred' property of the estate by secretly opening an account and depositing estate funds which he inappropriately used...." *Id.* at 642–43. *See also In re Nordic Village, Inc.,* 915 F.2d 1049, 1055 n. 3 (6th Cir.1990), *rev'd on other grounds,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).

## CONCLUSION

Schwab was a conduit, not a transferee. Johnson impermissibly spent estate funds. His manner of doing so was functionally equivalent to withdrawing cash from the estate's account and spending it. In order to prevent inequity, liability for misappropriation of estate funds should be attributed to the responsible party, not to an innocent intermediary.

The judgment is AFFIRMED.